RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BLUEGRASS MATERIALS COMPANY, LLC,

          *Plaintiff - Appellant*,

    *v.*

FRANK W. FREEMAN; JAMES M. FREEMAN; LAURA A. SCHOONOVER, fka Laura A. Freeman; BLACK GOLD OIL CO., dba C&L Exploration Co.; C&L FARMS, a partnership,

          *Defendants - Appellees*.

> No. 22-5091

─────────────────

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:18-cv-00177—Gregory N. Stivers, District Judge.

Argued: October 27, 2022

Decided and Filed: November 23, 2022

Before: COLE, CLAY, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** K. Brad Oakley, JACKSON KELLY PLLC, Lexington, Kentucky, for Appellant. Kenneth A. Meredith, II, Bowling Green, Kentucky, for Appellees. **ON BRIEF:** K. Brad Oakley, Mary Elisabeth Naumann, JACKSON KELLY PLLC, Lexington, Kentucky, for Appellant. Kenneth A. Meredith, II, Bowling Green, Kentucky, for Appellees.

─────────────────

## OPINION

─────────────────

MATHIS, Circuit Judge. Bluegrass Materials Company, LLC ("Bluegrass") owns property that is subject to an oil and gas lease. Believing that lessees, James M. Freeman, Frank

W. Freeman, and Laura A. Schoonover (collectively, the "Freemans"), were producing an insufficient quantity of oil to justify maintaining the lease, Bluegrass purported to terminate the lease and initiated this action seeking a declaration that the lease had terminated by its own terms, as well as asserting a number of other related claims. The district court found that Bluegrass's termination of the lease was improper and granted summary judgment to the Freemans and Black Gold Oil Co. d/b/a C&L Farms and C&L Farms (collectively, "Black Gold").[1]  Bluegrass appeals the district court's order granting summary judgment to the Freemans and Black Gold, denying Bluegrass's motion for summary judgment, and denying Bluegrass's motion to exclude the opinions of the Freemans' proposed expert witness, Ms. Karen J. Greenwell ("Ms. Greenwell"), as moot. Because there is a factual dispute regarding whether the lease terminated by its own terms, we **REVERSE** the district court's order granting the Freemans' and Black Gold's motion for summary judgment, **AFFIRM** the denial of Bluegrass's motion for summary judgment, **VACATE** the denial of Bluegrass's motion to exclude the opinions of Ms. Greenwell as moot, and **REMAND** to the district court for further consideration.

**I.**

This action arises from an oil and gas lease on property owned by Bluegrass and located in Bowling Green, Kentucky (the "Subject Property"). Many of the relevant facts are undisputed. Pursuant to a November 20, 1985 agreement (the "Manning Lease" or "Lease"), Hettie F. Manning, as lessor, granted to Black Gold, as lessee, rights to oil and gas on an approximately 100-acre tract of land on the Subject Property that is adjacent to a quarry. The term of the Manning Lease is divided into two parts: there is a long-expired one-year term, followed by a secondary term that conditions the maintenance of the leasehold interest on the production of oil or gas by the lessee.[2] The Manning Lease specifies the term as follows:

---

[1]Black Gold remains a party based on its royalty interest. The issues on appeal primarily involve the Freemans.

[2]At all relevant times, the parties were operating within the secondary term of the Manning Lease.

> It is agreed that this lease shall remain in force for a term of ONE (1) year from this date, and as long thereafter as oil or gas, or either of them, is produced from said lease by the lessee.

(R. 83-5, PageID 1106).

The Kentucky Division of Oil and Gas (the "Division") granted Black Gold two permits to drill wells for oil on the Subject Property. The Division granted a permit for a third well, but Black Gold plugged that well in June 1988 because it was a dry hole. It is undisputed that the first two wells have produced at least some oil.

In 1990, Black Gold assigned its leasehold interest in the Manning Lease to the Freemans, making the Freemans the operators under the Lease. Black Gold retained an overriding royalty interest of approximately seven percent. The issues on appeal involve the Freemans' activities as operators under the Manning Lease.

In 2010, Bluegrass purchased the quarry from Hydro Conduit Corporation. Bluegrass also purchased a 218-acre tract adjacent to the quarry, which included the Subject Property. Bluegrass owned the Subject Property subject to the Manning Lease and, as such, succeeded to the original lessor's interest, including the right to receive royalties equal to one-eighth of the oil or gas produced. According to Bluegrass, there are approximately three million tons of recoverable limestone reserves on the Subject Property today, worth between $4 and $20 per ton (ranging from $12 million to $60 million total).

In late 2016 or early 2017, Bluegrass applied for a conditional use permits to extend its quarry mining operations onto the Subject Property. The Freemans objected on procedural grounds, but the permits were approved. The Freemans then applied, on November 30, 2018, to drill two additional wells on the Subject Property. The Division issued permits for these wells on December 14, 2018—the same day Bluegrass filed its complaint. Additionally, James Freeman testified that the Freemans intended to reopen the third plugged well.

The parties' agreement on the facts ends there, as they disagree on the Freemans' oil production levels and sales. Bluegrass and the Freemans produced several pieces of evidence regarding the production and sale of oil under the Lease, including: an Oil Production Report

from the University of Kentucky; a report from the Division; oil purchasing records; and an Oil Run Ticket Report from Barrett Oil Purchasing, Inc. (the "Barrett Report"). Frank Freeman testified that the Barrett Report is the best document to know how much oil has been produced and what royalties have been paid. According to Bluegrass, the University of Kentucky Oil Production Report shows that oil was not produced or sold at various points in the Lease—centrally here, the 11- to 12-month period between the end of September 2015 and the end of September 2016—which is confirmed by the Barrett Report and Frank Freeman's own deposition testimony. On the other hand, the Freemans contend that the same records show that oil was constantly produced and that sales were made each calendar year.

The parties also disagree about whether Bluegrass received royalty payments from the Freemans as required by the Lease. According to Bluegrass, the Freemans made no royalty payments during the September 2015 to September 2016 period because no oil was sold. The Freemans assert that they produced oil and made oil sales each calendar year. Although the Freemans claim that 38 royalty checks were paid, totaling $14,877.00, between August 26, 2010, and the end of 2018, it appears that there were no royalty checks issued between October 20, 2015, and October 20, 2016. In late November 2019, after filing suit, Bluegrass refunded previous royalty payments it had accepted and began declining any new royalty payments because it believed the Lease had terminated following the Freemans' alleged cessation of oil production from September 2015 to September 2016.

On December 14, 2018, Bluegrass filed its complaint asserting four causes of action: (1) termination of the Lease pursuant to the Lease's habendum clause, (2) trespass, (3) waste, and (4) breach of the implied covenant of good faith and fair dealing. On December 18, 2020, the Freemans filed a motion to dismiss for lack of subject matter jurisdiction, claiming that complete diversity did not exist and that the amount in controversy was insufficient. That same day, the parties filed cross motions for summary judgment. In Bluegrass's motion for summary judgment, it raised an additional, and alternative, request for summary judgment to terminate the Freemans' right to establish additional wells on the Subject Property. Bluegrass also filed a motion to exclude the opinions of the Freemans' proposed expert witness, Ms. Greenwell. On January 12, 2022, the district court entered a memorandum opinion and order: (1) denying

Bluegrass's motion for summary judgment and its motion to exclude, (2) denying the Freemans' motion to dismiss,[3] and (3) granting the Freemans' motion for summary judgment.

## II.

We review a district court's grant of summary judgment *de novo*. *See Thacker v. Ethicon, Inc.*, 47 F.4th 451, 458 (6th Cir. 2022). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

On appeal, Bluegrass argues that the district court erred by: (1) granting the Freemans' motion for summary judgment based on the law of forfeiture; (2) granting the Freemans' motion for summary judgment on Bluegrass's claims for trespass, waste, and violation of the implied covenant of good faith and fair dealing; (3) denying as moot Bluegrass's motion to exclude the opinions of Ms. Greenwell; and (4) failing to consider Bluegrass's request for summary judgment on its claims for partial termination of the Lease. The crux of the alleged errors is that the district court misconstrued Bluegrass's Lease termination claim insofar as it construed Bluegrass's claim as based on forfeiture and analyzed it under Kentucky's forfeiture law. Bluegrass, in fact, alleged and argued that the Manning Lease terminated by its own terms. The district court's analysis of Bluegrass's Lease termination claim under forfeiture law impacted not only that claim, it affected Bluegrass's related claims. We conclude that there is a genuine issue of material fact about whether the Manning Lease terminated by its own terms. Accordingly, the district court erred in granting summary judgment to the Freemans and Black Gold.

### A.

Kentucky substantive law governs this action. Under Kentucky law, there are three distinct grounds under which an oil and gas lease may terminate: (1) abandonment; (2) forfeiture; or (3) termination of the lease by its own terms via a habendum clause (commonly referred to as

---

[3]The Freemans do not appeal the district court's denial of their motion to dismiss for lack of subject matter jurisdiction, nor do they dispute that subject matter jurisdiction exists in this Court on appeal. Indeed, we find that there was, and is, subject matter jurisdiction based on diversity of citizenship.

*ipso facto* termination).  *See Wheeler & Lemaster Oil & Gas Co. v. Henley*, 398 S.W.2d 475, 476 (Ky. 1965); *Hiroc Programs, Inc. v. Robertson*, 40 S.W.3d 373, 377 (Ky. Ct. App. 2000). Historically, there has been confusion about the differences between abandonment and forfeiture, though that same confusion has not existed about the distinct nature of *ipso facto* termination. Courts may analyze a lease for termination under all three grounds depending on the facts and circumstances of a given case, and we are not limited to only considering the grounds analyzed by the district court or those pled by the parties.  *See, e.g.*, *Delta Gas Corp. v. Thompson*, 951 F.2d 348, 1991 WL 2566568, at *2 (6th Cir. Dec. 3, 1991) (affirming summary judgment where the plaintiff pled only abandonment and the lower court "*sua sponte* considered the other two ways a lease can terminate").

The *Hiroc* court described the three grounds for terminating an oil and gas lease as follows:

> With respect to an oil and gas lease, the ground of forfeiture is the breach of an express or implied covenant, condition or obligation of the lease.  The second ground is abandonment,[4] which is the intentional and actual relinquishment of the leased premises.  The third and final ground occurs when the lease terminates by its own terms.  Where the primary term of an oil and gas lease has run and the lease provides for an extension for so long as oil or gas is produced in paying quantities, the lease will *ipso facto* terminate whenever production or development ceases for an unreasonable period of time.

40 S.W.3d at 377 (internal citations omitted).

## B.

Even though Bluegrass neither pled nor argued that the Freemans had forfeited their interest in the Manning Lease, the district court analyzed termination of the Manning Lease only under the forfeiture ground and found that Bluegrass had not established forfeiture as a matter of law.  We agree that the Freemans did not forfeit their interest in the Manning Lease.  To terminate an oil and gas lease based on forfeiture, the lessor must provide "notice that a forfeiture will be demanded, unless the terms of the lease as to development are carried out."

---

[4]In granting the Freemans' motion for summary judgment, the district court determined that abandonment did not apply because "[the Freemans] have continued to operate the subject wells, albeit at modest levels."  The parties do not dispute that abandonment is inapplicable to the facts of this case.

*Ledford v. Atkins*, 413 S.W.2d 68, 70 (Ky. 1967).  Bluegrass did not provide notice or a demand to the Freemans regarding oil production, nor does it claim to have done so.  Therefore, the Freemans did not forfeit their leasehold interest.  But that does not end the termination analysis.  We must consider the remaining termination ground: whether the Manning Lease terminated by its own terms.

## C.

Under Kentucky law, when interpreting a contract, we start by examining the plain language of the contract.  *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016).  A contract is "enforced strictly according to its terms", *O'Bryan v. Massey–Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966), with those terms being interpreted "by assigning language its ordinary meaning." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).  While oil and gas leases are contracts, there are slightly different interpretation rules that apply to them because they are considered "highly specialized contracts." *Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 592 (Ky. 2015).  For instance, and pertinent here, "parties who employ terms [in oil and gas leases] that have been judicially construed may be presumed to have intended the established meaning." *Id.*

An oil and gas lease may terminate by its own terms when it includes a habendum clause (also known as a "thereafter" clause).  A habendum clause is a provision "that defines the extent of the interest being granted and any conditions affecting the grant." *Id.* at 596 n.7 (citation omitted).  The Manning Lease includes such a clause, which provides that the Lease shall remain in force "as long thereafter as oil or gas, or either of them, is produced from said lease by the lessee."  To determine whether there has been an *ipso facto* termination, then, we must examine the Lease's habendum clause.

## D.

Under Kentucky law, two terms, though not expressly provided in the Manning Lease's habendum clause, are implied: ***first***, the Freemans must produce oil "in paying quantities," and ***second***, the Freemans may not cease production of oil for "an unreasonable period of time."

*See Hiroc*, 40 S.W.3d at 377. The Freemans' leasehold interest in the Manning Lease terminates if they fail to adhere to either of these two implied terms.

Kentucky courts define "paying quantities" as "such quantities as are susceptible of division between the parties and as will yield a royalty to the lessor that justifies the occupancy of and interference with his use of his lands by the operations." *Baker*, 473 S.W.3d at 596. Historically, a lessee had "the exclusive right to determine when a well is producing oil . . . in paying quantities." *Reynolds v. White Plains Oil & Gas Co.*, 250 S.W. 975, 976 (Ky. 1923). Courts were bound by the lessee's determination so long as there was no fraud or bad faith shown. *See Park v. Young*, 87 S.W.2d 963, 965–66 (Ky. 1935). That general rule has since been modified. Now, producing oil in paying quantities requires that oil production "be substantial and sufficient to pay the lessor a royalty justifying the obstruction and interference which he suffers as a result of the occupation and operation on his premises." *Cumberland Contracting Co. v. Coffey*, 405 S.W.2d 553, 555 (Ky. 1966); *see also United States v. 2,847.58 Acres of Land*, 529 F.2d 682, 691 (6th Cir. 1976). "[W]hether oil is found in paying quantities is a question of fact, to be determined from all the evidence in the case with reference to the rights of the lessor as well as the lessee." *Union Gas & Oil Co. v. Adkins*, 278 F. 854, 857 (6th Cir. 1922); *see also Warfield Nat. Gas Co. v. Allen*, 59 S.W.2d 534, 537 (Ky. 1933) (citation omitted).

On the question of what constitutes "an unreasonable period of time" to cease production of oil resulting in the termination of an oil and gas lease, Kentucky law seems to follow the old law school adage—it depends. *See Hiroc*, 40 S.W.3d at 378 (citing *Wheeler*, 398 S.W.2d at 476) ("What constitutes an unreasonable time depends on the facts and circumstances in each case."). What is clear is that a temporary cessation of oil production does not terminate the lease. *See Wheeler*, 398 S.W.2d at 476. Thus, the key inquiry is whether the Freemans failed to produce oil in paying quantities for an unreasonable period of time.

We find that there is a genuine dispute of material fact regarding whether there has been an *ipso facto* termination of the Manning Lease. Specifically, there are factual disputes regarding whether the Freemans produced oil in paying quantities and whether they ceased oil production for an unreasonable period of time.

Based on the definition of paying quantities, an analysis of the exact royalties paid is required.  The parties appear to agree that the Freemans have paid less than $15,000.00 in royalties to Bluegrass since 2010.  Bluegrass contends that the total amount of royalties paid by the Freemans from 2015 to 2018—the period between when Bluegrass alleges the Freemans stopped producing in paying quantities and filed suit—was $2,755.77.  The Freemans, relying on their proposed expert, Ms. Greenwell, assert that they have produced oil in paying quantities as long as the revenues derived from oil production after the payment of a royalty to Bluegrass exceed the cost of operating the wells—a definition inconsistent with that of *Baker*.  Importantly, the district court did not determine whether the Freemans had produced oil according to any definition of "paying quantities," finding only that the Freemans had operated the wells "at modest levels."  (R. 113, PageID 2426 n.3, 2428).  To determine if the Lease terminated by its own terms, the trier of fact must determine if the Freemans have produced oil in paying quantities after considering all the evidence in the case.  *See Union Gas*, 278 F. at 857.

Likewise, there is a material factual dispute about (1) whether the Freemans ceased producing oil for a period of time, and, if so, (2) whether that period of time was unreasonable.  Bluegrass points to the University of Kentucky's Oil Production Report, which shows that the Freemans produced zero barrels of oil between at least October 2015 and September 2016.  A report from the Division also shows zero barrels of oil produced from at least October 2015 to September 2016.  Further, the Barrett Report shows a gap in payments for oil from the Freemans' sole purchaser from September 28, 2015, to September 28, 2016.  The Freemans rely on the University of Kentucky's Oil Production Report as well but come to the opposite conclusion from Bluegrass based on a status column that shows "producing" for the months of October 2015 through September 2016.  James Freeman's testimony supports the Freemans' assertion of production: when asked if there was oil produced between September 28, 2015, and September 28, 2016, James Freeman testified, "Well, certainly.  There would have to be oil produced before 9/28/16 such that it was sold on 9/28/16." (R. 82-12, PageID 1354).

Finally, the one remaining issue is whether Bluegrass has waived its *ipso facto* termination claim by accepting royalty payments from the Freemans.  We find that it has not.  In *Cumberland*, the Kentucky Court of Appeals upheld the trial court's finding of an *ipso facto*

termination of an oil and gas lease based on the failure to produce oil in paying quantities even though the lessor had received some royalty payments for 23 months prior to filing suit. 405 S.W.2d at 554–56.

In sum, the foregoing disputes preclude a grant of summary judgment to either party regarding whether Bluegrass properly terminated the Manning Lease.

E.

As Bluegrass noted at oral argument, the district court's summary judgment decision on the Lease termination claim had a "domino effect" on Bluegrass's remaining claims. The adjudication of Bluegrass's claims for trespass, waste, and violation of the implied covenant of good faith and fair dealing, as well as Bluegrass's motion to exclude the Freemans' expert witness, Ms. Greenwell, are interrelated, in whole or in part, with the Lease termination claim. When there are multiple, interrelated issues, as in this case, a general remand is appropriate. *See Monroe v. FTS USA, LLC*, 17 F.4th 664, 669 (6th Cir. 2021).

For Bluegrass's trespass claim, the district court found that "[b]ecause the Manning Lease is still in effect, this claim fails." (R. 113, PageID 2431). For the waste claim, the district court found that the Freemans were entitled to summary judgment because "[t]he Manning Lease authorizes [the Freemans] to drill and produce oil and gas on the property, and the alleged wrongdoings by [the Freemans] are consistent with their rights under the Manning Lease." (*Id.* at 2433). For the claim of violation of the implied covenant of good faith and fair dealing, the district court found that "[u]nder the terms of the Manning Lease, [the Freemans] have the right to drill and produce oil on [Bluegrass's] property." (*Id.* at 2434). Lastly, the district court found that it was unnecessary to address the motion to exclude Ms. Greenwell's opinions because the court granted summary judgment in favor of the Freemans.**[5]** (*Id.*).

Regarding the claim for breach of the covenant of good faith and fair dealing, Bluegrass asserted this claim in the alternative to its claim that the Lease terminated by its terms. Accordingly, this claim is premised on the Lease remaining in full force and effect. The district

---

**[5]**The district court's order erroneously states that summary judgment was granted in favor of Bluegrass as Plaintiff, when in fact, summary judgment was granted to the Freemans.

court held that the Freemans had not breached the implied covenant of good faith and fair dealing by expressing their intent to increase the number of wells because the Freemans were exercising their rights under the Lease to drill and produce oil on the Subject Property. However, the factual question remains whether the Freemans were exercising their contractual rights in good faith and in consideration of Bluegrass's interest. *See McMahan v. Boggess*, 302 S.W.2d 592, 594 (Ky. 1957) (holding an oil and gas lessee "owes a duty of diligence which would be reasonably expected of an operator of ordinary prudence, having due regard for both the interest of the lessee and the interest of the lessor"). Bluegrass presented evidence from which a reasonable factfinder, viewing the evidence in the light most favorable to Bluegrass, could conclude that the Freemans were not.

Thus, because we find that the district court erred in granting summary judgment to the Freemans on the Lease termination claim, we hold that the district court erred in granting summary judgment to the Freemans on the claims for trespass and waste. Further, the district court erred in granting summary judgment to the Freemans on the violation of the implied covenant of good faith and fair dealing because there is a genuine dispute of material fact. We also vacate the district court's order denying Bluegrass's motion to exclude Ms. Greenwell's opinions as moot.

F.

Bluegrass contends that the district court erred in not considering its alternative ground for summary judgment: partial termination of the Lease. This claim was first asserted in Bluegrass's motion for summary judgment. The Freemans argue that because the issue did not appear in Bluegrass's complaint and Bluegrass did not move to amend its complaint once it decided to rely on this theory, this issue is not properly before us. Because we find that there are factual disputes that preclude summary judgment on Bluegrass's Lease termination claim, and because Bluegrass's partial termination claim is related to its Lease termination claim, it is unnecessary for us to address Bluegrass's partial termination claim and the district court can consider this claim, and the other claims, on remand.

**IV.**

In summary, we **REVERSE** the district court's grant of summary judgment to the Freemans and Black Gold, **AFFIRM** the district court's denial of Bluegrass's motion for summary judgment, **VACATE** the denial of Bluegrass's motion to exclude the testimony and opinions of Ms. Greenwell as moot, and **REMAND** for further proceedings consistent with this opinion.